UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| COSETTE L. MILLER,<br><br>                    Plaintiff,<br><br>      vs.<br><br>CAROLYN W. COLVIN,<br><br>                    Defendant. | 4:14-CV-04040-LLP<br><br>REPORT AND RECOMMENDATION |

**<u>INTRODUCTION</u>**

Plaintiff, Cosette L. Miller seeks judicial review of the Commissioner's

final decision denying her payment of benefits under Title II and Title XVI of the

Social Security Act.[1]  Ms. Miller has filed a Complaint and has requested the

---

[1]Supplemental Security Income (SSI) benefits are sometimes called "Title XVI" benefits, and Social Security Disability or Disability Insurance Benefits (SSD/DIB) are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled.   The definition of disability is the same under both Titles.  The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five step procedure under Title II and Title XVI).  In this case, Ms. Miller filed her application for both types of benefits.  AR 24, 173-188,   Her coverage status for SSD benefits expires on

Court to reverse the Commissioner's final decision denying her disability benefits and to enter an Order awarding benefits.   Alternatively, Ms. Miller requests the Court remand the matter to the Social Security Administration for further development with instructions to (1) properly evaluate the opinions of her medical providers; (2) reassess her residual functional capacity; (3) reassess her testimony and credibility; (4) further develop the record with additional consultative exams, testing and expert vocational evidence as necessary; and (5) issue a new decision based on substantial evidence of the record as a whole and proper legal standards.   The matter is fully briefed and has been referred to this Magistrate Judge for a Report and Recommendation. For the reasons more fully explained below, it is respectfully recommended to the District Court that the Commissioner's Decision be REVERSED and REMANDED.

## **JURISDICTION**

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g).  Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Schreier's Standing Order dated October 16, 2014.

---

December 31, 2015.  AR 24, 223.  In other words, in order to be entitled to Title II benefits, Ms. Miller must prove she is disabled on or before that date.

## STIPULATED FACTS[2]

**A.     Administrative Proceedings.**

This action arises from Ms. Miller's applications for SSD and SSI benefits protectively filed on September 6, 2011, alleging disability since September 7, 2011, due to auto immune disorder, fibromyalgia, migraines, depression, and obesity. AR 26, 75, 82, 85, 92, 173, 175, 182, and 226 (citations to the appeal record will be cited by "AR" followed by the page or pages).

Ms. Miller's claims were denied initially and upon reconsideration. AR 112, 118, 121.  Ms. Miller then requested an administrative hearing. AR 124.

Ms. Miller's administrative law judge hearing was held on September 24, 2012 by the Honorable Robert Maxwell, ("ALJ"). AR 41.  Ms. Miller was represented by different counsel during the hearing. AR 41.  An unfavorable decision was issued on October 12, 2012. AR 21.

The ALJ found that Ms. Miller met the insured status for benefits through December 31, 2015, and she had not engaged in substantial gainful activity, ("SGA"), since the alleged onset date of September 7, 2011. AR 26. The ALJ found that Ms. Miller had multiple severe impairments including

---

[2]The stipulated facts were agreed upon and submitted by the parties.  <u>See</u> Docket. 10.  The paragraph numbers have been deleted and a few headings have been altered by the Court. The parties referred to the Plaintiff by her first name but the Court refers to her by her surname.  A few grammatical and/or stylistic changes have been made.  Otherwise, the stipulated facts are recited in this opinion from the parties' submission.

fibromyalgia, obesity, and migraines, but that none of her impairments met or medically equaled a Listing. AR 26-29.

The ALJ also found that Ms. Miller had additional medically determinable impairments including diabetes type 2, obstructive sleep apnea, arthritis syndrome, thyroid disorder, affective disorder, and personality disorder, but determined that all of these impairments were nonsevere. AR 26-27.

The ALJ determined that Ms. Miller's mental impairments caused her mild limitations in activities of daily living, social functioning, and in concentration, persistence or pace. AR 27-28.

The ALJ determined that Ms. Miller had the residual functional capacity ("RFC") to perform less than a full range of light work: she was limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently, sitting with normal breaks for about 6 hours out of an 8-hour workday, standing or walking with normal breaks about 4 hours out of an 8-hour workday, limited to frequent stooping, crouching, kneeling, crawling, and climbing of ladders, ropes, scaffolds, stairs and ramps. AR 26-29.

The ALJ found that Ms. Miller's medically determinable impairments could reasonably be expected to cause the symptoms alleged by her, but her statements concerning the intensity, persistence and limiting effects of those symptoms were not fully credible to the extent they were inconsistent with the RFC determined by the ALJ. AR 29-30.

Based on the RFC determined by the ALJ, the ALJ found with the assistance of a vocational expert that Ms. Miller was able to perform her past relevant work as a credit card analyst, a customer service clerk, and a technical support person. AR 32.   The ALJ stopped the sequential evaluation at this 4th step and concluded Ms. Miller was not disabled. AR 32-33.

Ms. Miller timely requested review by the Appeals Council. AR 19.   The Appeals Council considered the additional evidence that Ms. Miller submitted, but denied her request for review, making the ALJ's decision the final decision of the Commissioner. AR l-7.   Ms. Miller then timely filed this action.

**B.     Plaintiff's Age, Education and Work Experience.**

Ms. Miller was born in 1970, making her 42 years old at the time of the decision. AR 182. She completed college in 2008. AR 227.

The vocational expert, ("VE"), found Ms. Miller had past work as a credit card analyst, customer service clerk, and technical support person. AR 266. The ALJ noted the VE's findings, and stated in the decision that Ms. Miller reported she worked as a software technician, a credit card analyst and a customer service clerk, citing exhibits 10E and 13E. AR 32. Ms. Miller reported in exhibit 10E that she worked for Cigna Home Delivery Pharmacy between June 2006 and September 2011, and her duties were to process medication changes for cost savings as a pharmacy technician at a mail order pharmacy. AR 227, 263.  Her duties at Citibank between May 2002 and June 2006 involved credit analysis.  Id.   Her duties at Software Unlimited between

5

March 2000 and January 2002, and at Sweet Computer Services between March 1998 and March 2000 involved software support technician. Id.

## C.   Relevant Medical Evidence.

### 1.   Sanford Clinic – Family Medicine: Douglas R. DeHaan, MD:

Ms. Miller was seen by Dr. DeHaan on 9/23/10 for a headache, 3 days after being treated in the emergency room for a migraine headache. AR 290. At the time her headache occurred, Ms. Miller was taking hydrocodone and the antidepressant Nortriptyline as a prophylactic medication.   Id.  Her depression was described as stable, but she had recently stopped Wellbutrin and started Zoloft. AR 291 .  The objective examination revealed a normal neurological examination, intact sensation and cranial nerves, a normal gait, a normal range of neck motion, and no tenderness.  AR 291. Ms. Miller's other ongoing diagnoses included hypertension, diabetes, fibromyalgia, dysthymia, iron deficiency, hypothyroidism, and Gastroesophageal reflux disease ("GERD"). AR 293.

Ms. Miller was seen for other minor matters by other doctors at the clinic, but next saw Dr. DeHaan for her fibromyalgia on 1/14/11. AR 310. Ms. Miller reported soft-tissue pain in her chest, trunk, arms, back, buttocks, and legs, and noted that the pain was fairly severe and gradually worsening lately. AR 3l0.  She also reported moderate fatigue which was also gradually worsening. Id.  Her medications included Neurontin, Vicodin, Zoloft, Amerge for headaches, Prilosec, and Pamelor. AR 310-311.  Ms. Miller was considering applying for short-term disability and requested that an FMLA

form be completed. AR 311.  Dr. DeHaan's exam documented tenderpoints including Ms. Miller's chest, trunk, arms, buttocks, and legs, and his impression was moderately severe fibromyalgia which was gradually worsening. Id.  Neurontin was started and Dr. DeHaan completed the FMLA form. Id.

Ms. Miller saw Dr. DeHaan again on 1/28/11 to complete short term disability paper work. AR 320.  She had been off work since 1/13/11 due to fibromyalgia pain which was aggravated by her job which required sitting at a computer all day and caused more pain in her arms, back, chest, neck and legs. Id.  Ms. Miller reported being extremely tired and sleeping most of the time she was off work. Id. She reported that the gabapentin (a/k/a Neurontin) started on 1/14/11 was starting to help the pain, and that the day of her appointment was her first pain free day. Id. Dr. DeHaan increased the gabapentin dosage, completed the disability forms, and recommended more aerobic exercise. Id.

Dr. DeHaan saw Ms. Miller next on 6/29/11 to follow up on treatment Ms. Miller received in the emergency room for chest pain. AR 325.  The pain was not like any Ms. Miller had experienced before, but Dr. DeHaan noted bilateral chest wall tenderness along either side of her sternum without crepitance, but Dr. DeHaan doubted it was cardiovascular disease. Id. Dr. DeHaan noted that the emergency room evaluations were negative including CXR, ECG, labs and stress ECHO. Id.  The emergency room examination revealed Ms. Miller was alert, oriented x3, pleasant, cooperative,

and had a depressed demeanor.  AR 345, 548, 555-56, 564, 581.  She had a normal mood, affect, and behavior; her neck, chest, cardiac and abdomen examinations were unremarkable; she had normal heart and breath sounds; her neck was supple with a normal range of motion; she denied headaches, exercise intolerance, neck pain, swelling or redness of her joints, syncope and light-headedness; she was independent in activities of daily living; her extremities had no edema or tenderness; and she had normal muscle strength and sensory examination. Id.  The Review of Systems was positive for cardiovascular chest pain, and positive for musculoskeletal back pain. AR 548, 564. Ms. Miller's EKG included abnormalities with severity borderline, and her lab finding for CK, WBC, and Seg Neut Absolute were not in the normal range. AR 548, 549, 565-67.  On the stress ECHO, Ms. Miller completed 6 minutes or the end of Bruce Protocol Stage II, and it was negative for ischemia.  AR 348. Ms. Miller was following up with Dr. Solberg, a cardiologist. AR 342-345; AR 325-326.

Ms. Miller next saw Dr. DeHaan for her annual checkup on 8/3/11. Ms. Miller reported chronic fatigue, diffuse pain consistent with fibromyalgia, and more headaches recently. AR 329. Dr. DeHaan performed a gynecological exam which was normal. Id.  His assessment included fibromyalgia (AR 330), and he increased the Nortriptyline for improved chronic pain control and insomnia, counseled Ms. Miller on exercise and weight loss, and told her to return annually or as needed. AR 330.  The comment by the medical assistant stated, "Concerns that she would like to go on disability." Id.

Ms. Miller saw Dr. DeHaan again on 8/2/12 for her annual checkup. AR 395. Ms. Miller again reported chronic fatigue and diffuse trigger point tenderness consistent with fibromyalgia. AR 396. She said that her pain was a 3 on a scale of 0-10. AR 414. She continued to have migraines, worse lately, and depression which was stable and without suicidal thoughts. Id. A breast exam and pelvic exam were normal. AR 396. Ms. Miller's pelvic exam indicated her extremities were normal with no deformities or edema. Id. The Review of Systems showed Ms. Miller's extremities were positive for diffuse trigger point tenderness consistent with fibromyalgia, neurologic review of systems (ROS) was positive for migraine headaches, which were worse lately, and psychiatric ROS was positive for depression: stable, denied suicidal thoughts, had chronic fatigue. AR 395-396. Dr. DeHaan's assessments continued to include migraine, depression, and fibromyalgia, and he counseled Ms. Miller on exercise, diet, and weight loss. Id. As of 8/2/12 Ms. Miller was noted under Social ADL as not exercising, and her exercise goal was noted as two times per week for 15 minutes. AR 401. Ms. Miller was also scheduled for a routine colonoscopy on August 8, 2012, where the pre-procedure examination revealed normal mental status, lung and heart functions. AR 456.

The appeal record contains two Fibromyalgia Questionnaire and Physician's Statements ("Physician's Statement"), from Dr. DeHaan. The first is dated 8/24/12. AR 364-367. The second is an updated version of the Statement, dated three weeks later on 9/14/12 with minor changes, and an

added sheet documenting specific tender points for Ms. Miller. AR 417-421. Both Physician's Statements document that Dr. DeHaan has treated Ms. Miller for two and one-half years and that she is diagnosed with fibromyalgia as well as depression, sleep apnea, ADD, hypertension, diabetes, hypothyroidism, anemia, and migraines. AR 364, 417.

On both Physician's Statements Dr. DeHaan noted symptoms of multiple tenderpoints, nonrestorative sleep, chronic fatigue, irritable bowel syndrome, frequent severe headaches, depression, hypothyroidism and chronic fatigue syndrome. AR 364, 417.  On the updated Physician's Statement he added morning stiffness as an additional symptom.  AR 417.

On both Physician's Statements Dr. DeHaan indicated that Ms. Miller was not a malingerer and that emotional factors do contribute to her symptoms and functional limitations. AR 364, 417.

On the 8/24/12 Physician's Statement Dr. DeHaan indicated Ms. Miller had pain bilaterally in her lumbosacral spine, chest, shoulders, arms, and legs. AR 365.  In the updated Physician's Statement he added pain bilaterally in the cervical and thoracic spine, hands/fingers, hips, and knees/ankles/feet. AR 418. The pain is described as constant and moderately severe. AR 365, 418.

On both Physician's Statements Dr. DeHaan indicated that Ms. Miller's attention and concentration necessary to perform even simple work tasks would typically be interfered with on an occasional basis. AR 365, 418.  He stated she could only tolerate work stress in a low stress job. Id.

10

On the 8/24/12 Physician's Statement Dr. DeHaan indicated Ms. Miller was limited to sitting two hours at one time in a competitive work setting, but later changed it to one hour on the 9/24/12 Physician's Statement. AR 365, 418.  He indicated she could sit a total of six hours of an eight-hour work day, but would need 10 minutes of walking around every three hours, and would require 10-15 minute unscheduled breaks every three to four hours where she could sit quietly, and with prolonged sitting she would need to elevate her legs one foot about 20 percent of the workday. Id.

On the 8/24/12 Physician's Statement Dr. DeHaan indicated Ms. Miller could stand/walk about two hours of an eight-hour workday, but he later reduced that to less than two hours on the 9/24/12 Physician's Statement. AR 365, 418. He stated she could stand about 30 minutes at one time. AR 366, 419.

On both Physician's Statements Dr. DeHaan indicated that Ms. Miller could lift and carry 10 pounds occasionally and never lift and carry 20 pounds or more. AR 366, 419. He also indicated she should rarely twist or climb stairs, and never stoop, crouch or climb ladders, and could rarely look down or up and sustain flexion of her neck, and only occasionally look left or right or hold her head static. AR 367, 420.

On both Physician's Statements Dr. DeHaan stated that Ms. Miller's impairments would likely cause "good days" and "bad days" and he estimated that she would miss about three to four days per month from work. AR 367, 420. On the 9/24/12 Physician's Statement Dr. DeHaan added a tenderpoint

chart indicating Ms. Miller had pain in 18 of the standard 18 tenderpoint locations, as well as pain on each shoulder and her forehead. AR 421.

The ALJ noted that both Physician's Statements provided by Dr. DeHaan would limit Ms. Miller to less than sedentary work activity. AR 32, 67-69.

In a medical treatment note sent to the Appeals Council, Dr. DeHaan reported that he saw Ms. Miller again for her fibromyalgia on 9/16/12. AR 643. She reported stable moderate soft tissue pain in her forehead, neck, chest, bilateral torso, both shoulders, upper arms, forearms, lower back, buttocks, and upper legs. Id. She also reported moderate fatigue and moderate depression, the latter of which was controlled with medicine. Id. Dr. DeHaan also noted moderate IBS symptoms. Id. Dr. DeHaan noted that Ms. Miller is applying for disability, and his exam confirmed tender points at the same locations Ms. Miller had soft tissue pain, and his assessment was moderately severe fibromyalgia overall course unchanged. AR 644. Ms. Miller requested a form for her disability case documenting the specific number of tenderpoints because some of her records just indicated "multiple." Id. Dr. DeHaan completed the form, left her medications unchanged and recommended she follow up in six months or as needed. Id.

In a letter submitted to the Appeals Council dated August 19, 2013, Dr. DeHaan stated Ms. Miller has been diagnosed with fibromyalgia, migraine headaches, and depression with her fibromyalgia diagnosis confirmed by Ms. Miller's Rheumatologist and himself. AR 646. He stated this condition is characterized by pain and fatigue and made it very difficult to maintain a

regular job due to the degree of pain and fatigue. Id.  He stated Ms. Miller is on medication for pain, but noted that nothing will eliminate the pain, and her condition is long term and probably lifelong. Id.  Dr. DeHaan then invited contact if there were further questions regarding her medical care. Id.

### 2.    Avera Rheumatology and Orthopedic Institute: Joseph J. Fanciullo, MD:

The earliest rheumatology exam in the appeal record is an 8/18/05 exam with Dr. Fanciullo when Ms. Miller's care was transferred for a five-year history of bilateral uveitis[3] that was controlled with corticosteroid drops. AR 391. The examination notes that she had also been previously diagnosed by another rheumatologist with fibromyalgia, and she had a positive rheumatoid factor. Id.  Ms. Miller related a two year history of myalgia and fatigue with the fatigue slowly increasing recently. Id.  Ms. Miller also had been experiencing ocular migraines and other migraines. Id.  She was taking Zyrtec, Wellbutrin, Strattera, Prozac, Atenol, Amerge and Excedrin for migraines, and Trazodone. Id.  The examination revealed that Ms. Miller was 5'4" tall, weighed 222 pounds, had multiple tenderpoints suggestive of fibromyalgia, and exhibited no detectable synovitis. AR 391, 393. Dr. Fanciullo's impression was that Ms. Miller probably did have fibromyalgia, but it was unrelated to her uveitis. AR 393.  He suspected an underlying systemic process leading to the uveitis. Id.

---

[3] Uveitis is a general term used to describe a group of inflammatory diseases that produces swelling and destroys eye tissues. These diseases can slightly reduce vision or lead to severe vision loss. http://www.nei.nih.gov/health/uveitis/uveitis.asp.

At a follow up exam on 11/10/05, Dr. Fanciullo confirmed the fibromyalgia diagnosis, but had been unable to identify the suspected underlying systemic process related to the uveitis. AR 387.

Ms. Miller was seen next on 12/27/06, and continued to ache all over, but had also had another bout of uveitis. AR 383.  She reported pain in her hips, knees, elbows and shoulders, morning stiffness, and occasional GERD. Id.  Dr. Fanciullo again confirmed multiple fibromyalgia tenderpoints. Id.  She was started on Imuran therapy for the uveitis. Id.

The Imuran was stopped due to side effects and changed to methotrexate. AR 380-38l.  Dr. Fanciullo's impression included a history of possible inflammatory arthritis. AR 379.  By a 6/13/07 examination, his impression was inflammatory arthritis and uveitis. AR 378. Ms. Miller reported that her eye problem seems to be stabilized and she had not had to use the steroid eye drops in "quite some time." Id.  Ms. Miller reported that her joint pain is a little better as well, she had no major flares, and the physical examination revealed no evidence of any inflammation of the wrists, hands, knees, or elbows. Id.  On 7/3/07 Ms. Miller was given prednisone burst for flares of pain in her shoulder, hands and wrists. Id.  Ms. Miller's pain continued and following a 7/12/07 examination she was given hydrocodone. At that examination there was no tenderness in the muscles and no fibromyalgia tenderpoints. AR 374.

Ms. Miller was seen on 10/1/07 and was on a low dose of methotrexate, which was helpful with her joints and she had no uveitis reoccurrence.

Dr. Fanciullo's assessment was arthritis uveitis syndrome. AR 373. However, due to complications with other medical conditions the methotrexate was stopped by 3/31/08. AR 370.

Ms. Miller next saw Dr. Fanciullo at the Avera Rheumatology clinic on 1/8/10. AR368. Ms. Miller was seen for her fibromyalgia and was hurting "all over." Id. She was on Provigil and Savella prescribed by her family physician. Id. Dr. Fanciullo's examination revealed multiple fibromyalgia tenderpoints including trapezius, anterior neck, anterior chest, brachioradialis, lateral aspects of the hips, and medical aspect of the knees, and brachioradialis muscles with no synovitis of the wrists or hands. Id. Dr. Fanciullo noted that Ms. Miller had not had uveitis in quite some time. AR 368. His impression was chronic uveitis, arthritis syndrome in prolonged remission, and fibromyalgia. Id. Dr. Fanciullo stated he had nothing else to offer for medications since she had already tried pretty much everything including Lyrica, Cymbalta, and now Savella, and had also been on hydrocodone and Relefan. Id. He noted she had been riding a stationary bike one to two times per week, and he advised Ms. Miller to get more consistent with the bike. Id. He noted that she would be getting her medications from her primary care physician, and advised her to begin a very low level aerobic conditioning program such as the stationary bike three to five times per week. AR 369. He told her to follow up with him if she developed problems with the uveitis or inflammatory arthritis. Id.

### 3.   Sanford Behavioral Health:

Records from Sanford Behavioral Health which are included in the appeal record begin with a 9/7/10 call from Ms. Miller complaining that her Wellbutrin was causing nausea and vomiting. AR 363.  She was told to stop talking the medication and scheduled to see Linda Kauker, PA-C.  Id.

Ms. Miller was seen on 9/17/10 by Linda Kauker, PA-C. AR 361. Ms. Miller was talking Savella and Provigil for her fibromyalgia, but it was not helping and she had been missing quite a bit of work that year due to her fibromyalgia.  Id.  Ms. Miller indicated that she is tired when she gets home from work every day so she has not been exercising or engaging in weight loss. Id.  She reported that her depression and anxiety are about equal and needed to be addressed. Id.  Ms. Miller reported she was sleeping fairly well, was not having racing thoughts or hallucinations, but had low energy, and was still able to concentrate enough to maintain accuracy in her work. Id. The objective exam was normal, she was spontaneous and friendly, she had an appropriate affect and speech, her thoughts were concrete and linear, and there were no psychotic or psychomotor abnormalities.  Id.  The impression was depressive disorder NOS, generalized anxiety disorder, AD/HD per history, borderline traits per history, and her GAF was assessed at 55-60. AR 361. She was started on Sertraline and her Savella was decreased. AR 362.

Ms. Miller was seen again on 1/14/11 and reported that her fibromyalgia had "really been beating her up the past few weeks." AR 360.

She said she had been missing work about two days per week and was considering short-term disability because of her pain and discomfort. Id.  She also reported her depression had gotten worse. Id.  Linda Kauker again assessed Ms. Miller as alert, oriented, in no acute distress, with a euthymic mood, a full and appropriate affect, normal speech, concrete and linear thoughts, and no psychotic or psychomotor disturbances, her impressions remained unchanged, and she increased Ms. Miller's Zoloft dosage, and individual therapy was recommended. Id.

Ms. Miller was seen again on 3/11/11 and she reported that due to her fibromyalgia she had reduced her work hours to 24-32 hours per week. AR 359.  She was taking Gabapentin which helped with her pain, but she was having fatigue issues. Id.  She reported the prior increase in the Zoloft dosage was helpful and she was having less low moods. Id.  The objective findings were again unchanged and normal. Id.

Ms. Miller saw Linda Kauker again on 8/4/11 and when asked how things were she said, "Terrible, my health has been bad. I've missed a lot of work due to my fibromyalgia." AR 357.  She reported she felt she may be fired from her job due to absences and was considering filing for disability. Id.  She reported feeling down and anxious fairly often, her energy level was down, and her focus and concentration at work were not as good as they used to be. Id.  She reported she was making mistakes or forgetting some things she is supposed to say in her job. Id. Ms. Kauker's objective findings show Ms. Miller's mood as having kind of a serious tone with a congruent

17

affect, which was unusual for Ms. Miller, and show Ms. Miller as alert, pleasant and calm, her speech was normal in rate and tone, her thoughts were concrete and linear without psychotic indices, and she had no evidence of psychomotor agitation or retardation. Id. Her Zoloft dosage was increased and she was started on Intuniv[4]. AR 358.

A medical treatment note submitted to the Appeals Council shows that Ms. Miller next saw Linda Kauker on 9/19/12. AR 647. Ms. Miller reported that she had been terminated from her job in September 2011, and was off her psychiatric medications from November 2011 to February 2012 because she could not afford them. Id. She reported sleeping well, increased anxiety lately, but no depression currently. Id. She said her Zoloft was working well. Id. Ms. Kauker's impressions were anxiety disorder NOS and depression by history. AR 648. Ms. Kauker noted that Ms. Miller wanted to follow up in four months, but she is financially strapped without working and agrees to call if she has problems in the meantime. Id. The mental status examination revealed that Ms. Miller was alert and oriented, she was spontaneous and friendly, her mood was primarily euthymic, her speech was normal, her thoughts were coherent, and there was no psychosis or psychomotor disturbance. AR 647.

---

[4] Intuniv is a drug used to treat AD/HD.
See http://www.webmd.com/drugs/drug-152956-
Intuniv+ER+Oral.aspx?drugid=152956&drugname=Intuniv+ER+Oral

**4.      Healthwise Chiropractic: Chad Neki, DC:**

The appeal record contains treatment records for chiropractic treatment from Dr. Neki for 3/4/11 to 9/5/12. AR 623-35.

In March of 2011 Ms. Miller was seen for a series of treatments. AR 624-628. Ms. Miller received treatment for her neck, upper back, and lower back. AR 624. Ms. Miller reported that her daily activities were seriously affected and she had to take time off work during February because of her fibromyalgia symptoms. Id.   Dr. Neki's exam revealed hypertonic musculature, subluxations and tenderness in her cervical and thoracic spinal regions. Id.

Ms. Miller continued treatment through 3/22/11. AR 625-628.  On 3/11/11 Ms. Miller reported she worked less that week and was having moderate headaches and bilateral upper back and shoulder pain. AR 625. The exam revealed similar findings as before, and moderate pain, significant edema, and active trigger points overlying the thoracic range bilaterally. Id. On 3/15/11 Ms. Miller reported that the pain still seriously affected her daily activities with the afternoon usually worse. AR 626.  She reported she had to leave work early that day due to lower back pain and mid back pain the prior day. Id.   Dr. Neki's exam continued to reveal similar findings as prior exams. Id.   On 3/18/11 Ms. Miller reported she had been unable to work for two days due to lower back pain. AR 627.  On 3/22/11 Ms. Miller reported her

neck pain was a 2, her upper back pain was a 3, and her lower back pain was a 5 on a scale of 1-10. AR 628.

Ms. Miller received additional treatments from Dr. Neki on 2/10/12, 2/14/12, and 3/23/12 for pain in her neck, upper back, and lower back, where her pain had worsened to a marked degree. AR 629-631. Ms. Miller reported her pain was seriously affecting her daily activities. AR 629.  She reported that her pain was usually worse in the afternoon. Id.  She had to quit her job in September the prior year due to more severe fibromyalgia pain and muscle spasms, so she was not working. Id.  She reported moderate headaches, and neck and lower back pain which radiates into both legs. Id. Dr. Neki's exam generally revealed moderate pain, muscle spasms and tender trigger point in the cervical, thoracic, and lumbar spinal regions. Id. Dr. Neki's notes indicate slower than expected progress, noting no real improvement since her last visit. Id.  Ms. Miller was in a supportive phase of care and would see Dr. Neki on an as needed basis. Id.  On 2/14/12 Ms. Miller reported more pain with prolonged sitting or standing. AR 630. Her diagnoses at that time were thoracic subluxation, muscle spasms, lumbar sacrum and cervical subluxation, and headaches. Id.

Ms. Miller was seen again on 8/3/12 on a referral from Dr. DeHaan for a flare-up in headaches, and neck and back pain. AR 632. Ms. Miller reported that chiropractic treatment improved her headaches and pain symptoms in her lower back and neck, but reported that nothing works to make her symptoms better in her upper back. Id.  When she returned on 8/24/12, she

noted she had a new bed and her pain had improved, reporting mild symptoms in her neck, upper back, and lower back, and improved symptoms for her headaches. AR 634.

### 5.     State Agency Assessments:

The state agency experts reviewed Ms. Miller's records at the initial level and provided physical and mental assessments on 10/18/11. The agency expert found severe impairments of fibromyalgia, migraines, and obesity, and nonsevere medically determinable impairments of diffuse diseases of the connective tissue, diabetes, other disorders of gastrointestinal system, affective disorder, anxiety disorder, organic mental disorder, and personality disorder. AR 76, 86.

The mental health expert at the initial level concluded that the nonsevere mental impairments caused mild difficulties in maintaining concentration, persistence or pace, and no difficulties in maintaining social functioning and activities of daily living. AR 76, 86.

The physical expert at the initial level concluded Ms. Miller could lift 20 pounds occasionally and 10 pounds frequently, stand/walk four hours of an eight-hour workday, and sit walk six hours of an eight-hour workday. AR 78, 88. Ms. Miller was also limited to frequently climbing ramps/stairs, ladders/ropes/scaffolds, stooping, kneeling, crouching, and crawling, she was unlimited pushing and pulling, (except as noted in the lift and carry limitations), and unlimited balancing, and had no manipulative, communicative or environmental limitations. AR 78-79, 88-89.

At the reconsideration level state agency record reviews identified the same impairments as found at the initial level: severe impairments of fibromyalgia, migraines, and obesity, and nonsevere medically determinable impairments of diffuse diseases of the connective tissue, diabetes, other disorders of gastrointestinal system, affective disorder, anxiety disorder, organic mental disorder, and personality disorder. AR 96, 106.

The findings of the mental and physical state agency experts at the reconsideration level were virtually identical to the findings at the initial level. AR 97-100, 107-110.

## D.    Testimony at the ALJ Hearing.

### 1.    Ms. Miller's Testimony:

Ms. Miller testified that she completed high school, and received a degree in accounting from Colorado Tech, but had never utilized that training. AR 47, 61.

Ms. Miller testified she lived with her boyfriend who helps her financially. AR 58. Ms. Miller said she did file for unemployment, but was told she could not have it because she filed for disability. Id.

Ms. Miller testified she is 5'4" tall and weighed 243 pounds. AR 61. Ms. Miller testified she has pain trying to accomplish daily activities, like folding a basket of clothes where she takes a break and rests due to pain after folding only three or four items. AR 57.  When cooking she gets distracted and frequently burns things, and she is only able to clean if she takes frequent breaks, and usually the breaks last longer than the time spent

22

doing the activity. Id. She explained doing dishes she needed a break after 15 to 30 minutes, and would then rest for at least 30 minutes. Id. Ms. Miller said she does still drive, but not if she took a hydrocodone because she doesn't feel safe, they "make me out of it", and the furthest she had driven in the last six months was five to six miles to her attorney's office. AR 58.

Ms. Miller testified she worked as a computer technical person at Software Unlimited and Sweet Computer Services, assisting customers with computer issues and accounting software. AR 48.  She left those jobs for other better jobs or due to relocation. AR 48-49.

Ms. Miller testified that she had lost her job at Cigna in September of the previous year because she was not performing up to standards. AR 47. She explained that at Cigna she would talk with customers on the phone, enter notes in the computer processing, or transcribing prescriptions and enter them on the computer. AR 48. Ms. Miller said that her pain got worse during the time she worked at Cigna, and as time went on she was able to concentrate less due to issues with pain from "having to do continual motions." Id.  She said she was not able to meet Cigna's standards for accuracy and was let go following prior verbal and written warnings. Id. Ms. Miller explained that she would make mistakes with doctor's names, quantities, and dates when transcribing prescriptions. AR 49, 55.

Ms. Miller testified that she had FMLA leave at Cigna and had used all of her available FMLA leave and her sick leave, which then led to the

23

disciplinary process with a notice of correction in August 2011, and termination in September 2011. AR 55-56.

Ms. Miller testified that she was diagnosed with fibromyalgia years ago by Dr. Eckhoff, and more recently by Dr. Fanciullo, but she was obtaining most of her current treatment from Dr. DeHaan. AR 47. Ms. Miller testified that she had positive fibromyalgia tenderpoints at all 18 locations on her body now, and years ago when first diagnosed with fibromyalgia she had 14 tenderpoints. AR 51-52. She testified that she saw Dr. DeHaan about every three to six months, and recently about once a year because she was at a point where there is not much else they can do for her, and there was a point when she did not have insurance for three months, and when she did have insurance early in the year they had a very high deductible to pay, so she tried to limit her visits to when she absolutely had to go. AR 59.

Ms. Miller testified that she takes Norco, which is hydrocodone and acetaminophen, when the pain gets too bad, the generic form of Synthroid for her thyroid problem, Amerge for her migraines, omeprazole, gabapentin, and the generic form of Zoloft for her depression. AR 49, 56.

Ms. Miller said that doctors had told her that exercise or weight management might be beneficial to her, but that was difficult for her due to pain, and she was not on any sort of regular exercise program, but does some weight management by watching her diet. AR 60. She said her rheumatologist had said to avoid things which cause pain and light aerobic exercise would

assist on those days when she wasn't feeling a lot of pain, but she feels pain most days. AR 62-63.

Ms. Miller testified that she also had problems sleeping including sleep apnea and insomnia with trouble getting to sleep and staying asleep, so she frequently naps through the day. AR 52. Ms. Miller said even with her napping she has fatigue problems and is still very tired, and her muscles are sore and achy. Id.

Ms. Miller testified she had also had problems with irritable bowel syndrome about four to five times per month. AR 52-53.

Ms. Miller testified she had headaches about once or twice a week and she gets migraines. AR 53.  She said she takes a combination of Excedrin and Amerge for her headaches, which helped to some degree, but does not always stop the pain right away. Id.

Ms. Miller testified she also receives chiropractic treatment for pain in her lower, center, and upper spine. AR 53-54.  She said she also has pain, fatigue and soreness in her chest, arms, shoulders, hands, and hips that increases with use. AR 54. When asked why some of these areas were not noted on Dr. DeHaan's form Ms. Miller explained that she has had fibromyalgia for a while and "some things have become normal for me." AR 54-55.

Ms. Miller testified she had been treated for depression and recently resumed treatment with Linda Kauker, after a period last year when she did not have insurance. AR 53. She said she had seen Ms. Kauker about four or

five times over the last three years, and her depression was fairly maintained by medications. AR 62.

Ms. Miller testified during the best part of her day she was limited to sitting 30 to 45 minutes at one time, before she needed to get up and walk around, and then she could sit another 30 to 45 minutes, and as the day progressed she would need to walk around more frequently and for a longer time. AR 50-51. She said in addition to the quality issues she had taking that many breaks impacted her ability to get the expected quantity of work done also. AR 51.

### 2.    Vocational Expert Testimony:

The VE was present by telephone during Ms. Miller's testimony. AR 42. The VE testified that prior to the hearing he had prepared a summary of Ms. Miller's work history, which was received as exhibit 13E, (AR 266), and in it he described her work as sedentary and either semi-skilled or skilled in nature. AR 64.

The first hypothetical question the ALJ asked the VE was to assume a person under 50, educated through the bachelor's level degree, a work history as the VE described, with limitations as noted and described in Ms. Miller's testimony, and the VE testified that the individual would not be able to do any of Ms. Miller's past work or any other full-time work due to the issues with chronic pain. AR 65.

The second hypothetical asked by the ALJ, which he stated was "intended to ask you about the state agency's assessment" in exhibit 6A,

(AR 93-101), assume someone the same age, education, and work experience as before and were limited to lifting or carrying up to 20 pounds occasionally and 10 pounds frequently, sitting with normal breaks about 6 hours out of an 8-hour workday, standing or walking with normal breaks about 4 hours out of an 8-hour workday, frequent climbing, stooping, crouching, kneeling, and crawling, unlimited balance and pushing/pulling within the lifting and carrying weight limits, and, no manipulative, visual, communicative, or environmental limitations.  The VE testified this would allow all past work. AR 66. The VE also testified that Ms. Miller can also perform all the sedentary occupations and a partial range of the light occupational base.  AR 67.

The ALJ then asked the VE about the limitations described in Dr. DeHaan's medical source statement received as exhibit 7F, (AR 417-421), except the ALJ omitted the limitations related to mental impairments such as the person attention and concentration necessary to perform even simple work tasks would typically be interfered with on an occasional basis, (AR 418), and the person could only tolerate work stress in a low stress job, (AR 419), and the VE testified the limitations described by the ALJ would preclude all past work and all other work, based on the three to four day per month absenteeism alone. AR 69.

The only hypothetical question to the VE which incorporated any limitations associated with concentration, persistence or pace due to either mental impairments or chronic pain was the hypothetical based on

Ms. Miller's testimony, since she testified to difficulties with both concentration and with pace.

The VE testified that there was no conflict between his descriptions of the cited jobs and how the *Dictionary of Occupational Titles* (DOT) describes them.  AR 69. Ms. Miller's counsel did not question the VE.  AR 69.

**E.    Other Evidence.**

Ms. Miller's earnings reports document consistent SGA earnings for the 15 years prior to her termination at Cigna. AR 202-203 .

In a work activity report dated 9/12/11, Ms. Miller stated she was allowed easier duties at Cigna due to her inability to concentrate. AR 215.

Ms. Miller completed a Function Report, dated 9/30/11, as part of her disability application in which she stated, some days she was unable to raise her arms to dress herself, she had too much pain or tiredness to shower, she was unable to curl her hair or use a hairdryer, raising her arms to shave caused problems, she was unable to cook most days, and she needed help sitting to use the toilet. AR 234. Ms. Miller said she needed a strict routine to help her remember things, and used a pill minder. AR 235.  She stated when making meals she was unable to stand and cook complete meals. AR 235. Ms. Miller stated she could unload the dishwasher for five to ten minutes, that it took her one hour or more to clean the bathroom every one to two weeks with frequent breaks, and her boyfriend prompts her and encourages her to complete these tasks. AR 235. Ms. Miller stated she has help shopping for groceries, and it takes one to two hours once a week, and it leaves her tired

for a couple of days. AR 236.  She stated it was difficult to concentrate when reading or watching TV, and she has difficulty lifting over 5 pounds, sitting, standing more than a few minutes, reaching, walking more than a block, kneeling, completing tasks, concentrating more than 5-10 minutes, understanding, and following instructions. AR 236-238.  Her social activities include spending time with others eating out at restaurants or their homes every few weeks. AR 237.

In a Disability Report dated 11/1/11, Ms. Miller reported she had not been able to meet her needs as well, with difficulty dressing, bathing and fixing meals. AR 245.

In a Third Party Function Report, dated 12/18/11, Ms. Miller's boyfriend stated Ms. Miller usually gets up between 10:00 a.m. and 1:00 p.m. usually naps again about two hours after getting up. AR 248.  He stated he needed to remind Ms. Miller to take care of her cat, that Ms. Miller often cannot sleep due to pain and takes baths in the middle of the night, that she often times does not get dressed, seldom brushes her hair unless she is going out, has problems cooking on the stove, and she gets distracted. AR 249.  He stated Ms. Miller may cook only once or twice per week, and she cannot cook without getting distracted. AR 250.  He stated Ms. Miller does clean the bathrooms once or twice a month and it takes her 30 to 40 minutes each. AR 250.  He noted that Ms. Miller goes outside 3-4 times a week, drives and rides in a car to travel, she can go out alone, and goes shopping 40-60 minutes 2-3 times a week.  AR 251.  He said Ms. Miller reads 2- 3 hours a day and watches

television 2-3 hours a day.  AR 252.  He noted that Ms. Miller gets tired quickly kneeling or stair climbing, and she has problems concentrating because she gets distracted and makes mistakes. AR 253.  He stated she can walk about 50-100 feet before needing to rest for two to five minutes, and can only pay attention for five to ten minutes. AR 253.  He also noted that whenever the weather changes Ms. Miller has a lot of pain and she gets migraines two to four times per week. AR 255.

**F.      Other Evidence Submitted To Appeals Council.**

Ms. Miller submitted multiple documents describing the FMLA protection she received while working at Cigna. AR 273-288. Ms. Miller described the essential functions of her job as entering prescriptions into the computer, analyzing costs, sending facsimiles, and talking to customers on the telephone.  AR 281.  First is Dr. DeHaan's physician's statement given to support the FMLA leave dated 1/8/10, in which Dr. DeHaan stated Ms. Miller had fibromyalgia causing diffuse pain and fatigue, and her medication caused sedation. AR 282. Dr. DeHaan stated Ms. Miller's condition will cause periodic flare-ups making it medically necessary for her to be absent from work due to pain and fatigue approximately two times per month for three days per episode. AR 283.

A 2/21/11 letter from Cigna to Ms. Miller acknowledged Ms. Miller's request for intermittent leave beginning 2/11/11 through 8/11/11 and showed that 12 weeks of leave had already been used as of 2/21/11.  AR 273.

An 8/11/11 interoffice memo from Cigna, DLE Supervisor to Ms. Miller gave her an attendance probation warning, after her seventh unscheduled event occurred on 8/3/11 and shows she was being placed on probation having failed to successfully complete her attendance written warning period. AR 276. The attached attendance record showed 511:20 FMLA hours used from 8/10/10 TO 8/9/11. AR 277-280.

A 9/7/11 interoffice memo from Debbie Hoffman, Cigna, DLE Supervisor to Ms. Miller regarding Ms. Miller's failure to meet the standards in the 8/11/11 attendance probation memorandum terminated her employment as of 9/7/11 due to unsatisfactory performance. AR 275.

## **DISCUSSION**

### A.    **Standard of Review.**

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Woolf, 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. Id. If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

**B.    The Disability Determination and the Five Step Procedure.**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment

32

must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.  The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary.  Bartlett v. Heckler, 777 F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as follows:

**Step One:**   Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, she is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments  the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett 777 F.2d at 1320, n.2.  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458, 460, (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

33

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If  the applicant's RFC allows her to meet the physical and mental demands of her past work, she is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow her to meet the physical and mental demands of her past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with her age, education, and past work experience.  20 C.F.R. § 1520(f).

## C.   Burden of Proof.

The Plaintiff bears the burden of proof at Steps One through Four of the Five-Step Inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt,  204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at Step Five.  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).

## D.   The Parties' Positions.

Ms. Miller asserts the Commissioner erred by finding her not disabled within the meaning of the Social Security Act.  She asserts the Commissioner erred in four ways:   (1) The Commissioner erred in evaluating the expert physicians' opinions; (2) The Commissioner erred in evaluating Ms. Miller's credibility; (3) The Commissioner failed to properly evaluate whether

Ms. Miller's fibromyalgia medically equaled a listed impairment; and (4) The Commissioner's determination of Ms. Miller's RFC is not supported by substantial evidence.

The Commissioner asserts substantial evidence supports the ALJ's determination that Ms. Miller was not disabled during the relevant time frame, and the decision should be affirmed.

**E.  Analysis.**

Ms. Miller assigns four points of error to the Commissioner's denial of benefits.  They are discussed in turn below.

**1.  The Commissioner's Evaluation of the Expert Medical Evidence.**

The ALJ's discussion of the medical evidence begins on page seven of his written decision (AR 30).  The ALJ reviewed medical records received from Ms. Miller's rheumatologist (Dr. Fanciullo); her behavioral health records from Sanford (Linda Kauker-PA-C); records from her primary care physician (Dr. DeHaan); and her chiropractic records (Chad Neki, D.C.).   He also considered the assessments of the non-treating, non-examining state agency medical consultants (Dr. Frederick Entwistle and Dr. Kevin Whittle).

Out of all the medical providers whose records were considered by the ALJ, only Ms. Miller's primary care physician (Dr. DeHaan) and the state agency consultants were asked to offer opinions regarding Ms. Miller's ability to function in the workplace.  Ultimately, the ALJ assigned declined to give controlling weight to the treating physician.  AR 32.  The ALJ instead assigned "little weight" to the opinion of Ms. Miller's primary care physician, but

assigned "great weight" to the opinion of the non-treating, non-examining state agency consultants. Ms. Miller asserts the ALJ erred in evaluating the expert medical evidence. The court agrees.

The ALJ's discussion of the weight he assigned to the medical opinions appears on page nine of his written decision (AR 32). It is reproduced below:

> Turning to the opinion evidence, the undersigned has considered the opinions of the claimant's primary care physician, Douglas DeHaan, M.D. . . .Dr. DeHaan opined that the claimant was essentially capable of less than a full range of sedentary work activity and would likely miss 3-4 days of work a month due to her impairments. In accordance with Social Security Ruling 96-2p, the opinions of treating physicians are to be analyzed with a deference towards giving controlling weight, provided they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. Dr. DeHaan's opinions are not assigned such weight because he is not a specialist and because the large treatment gaps do not support these extreme limitations. The claimant admitted she went over a year without seeing Dr. DeHaan. (Hearing testimony). In the interim, the claimant sought out chiropractic care and reported improved results with mild pain symptoms. . . . Due to these inconsistencies in the record, the undersigned affords Dr. DeHaan's assessments little weight.
>
> Conversely, the undersigned has considered the State agency medical consultants' assessments. . . . The medical consultants' (sic) opined the claimant was capable of less than a full range of light work activity. . . . The undersigned adopts the medical consultants' assessments as consistent with medical evidence of record taken as a whole and affords them great weight.

AR 32.

"Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding." Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)). "Indeed, when the treating physician's opinion is supported by proper medical testing and is not

inconsistent with other substantial evidence in the record, the ALJ *must* give the opinion controlling weight . . . However, an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. (citations omitted, punctuation altered, emphasis added). "Ultimately, the ALJ must 'give good reason' to explain the weight given the treating physician's opinion." Id. (citing 20 C.F.R. § 404.1527(c)(2)).

Additionally, SSR 96-2p instructs that,

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically accepted clinical and diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

See SSR 96-2p, POLICY INTERPRETATION, at p. 6.

Conversely, the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence. "We have stated many times that the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision." Cox v. Apfel, 345 F.3d 606, 610 (8th Cir. 2003) (citations omitted).  "This is especially true when the consultative physician is the only examining doctor to contradict the treating physician." Id. Likewise, the

testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th Cir. 2000) (internal citations omitted).

The factors to consider for assigning weight to medical opinions are set forth by regulation:

> (c) How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship.  **Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.**  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
>
> (i) Length of treatment relationship and frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight that we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****.  When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Support ability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of treating and other examining sources.

(4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors.  When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

See 20 C.F.R. § 404.1527(c) (Emphasis added).

As to Ms. Miller's RFC, the ALJ gave "little weight" to the opinion of her

treating physician (Dr. DeHaan).  AR at 32.  The ALJ explained he gave

Dr. DeHaan's opinion "little weight" for two reasons:  because (1) Dr. DeHaan

was not a specialist; and (2) Dr. DeHaan's opinion was inconsistent with the other record evidence because there were large treatment gaps in Ms. Miller's care with DeHaan which did not support the extreme limitations assigned by DeHaan and in the interim Ms. Miller sought chiropractic care which resulted in improvement and mild pain symptoms. Id.

In the face of contradictory opinions from the treating physician, the opinion of a non-examining state agency physician's opinion who has examined the claimant once or not at all generally does not constitute substantial evidence upon which an ALJ may deny a claim. Cox, 345 F.3d at 610. See also, Anderson v. Barnhart, 344 F.3d 809, 812-13 (8th Cir. 2003) (generally consulting physician opinion does not constitute substantial evidence but there are two exceptions: (1) where the consulting assessment is supported by better or more thorough medical evidence; (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions).

The ALJ assigned "great weight" to the state agency consultants' opinions in this case, because he determined they were "consistent with the medical record taken as a whole." AR 32.

In this instance, the court finds the ALJ's failure to give the treating physician's opinion controlling weight is not supported by substantial evidence. This is because, as explained below, Dr. DeHaan's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record. See 20 C.F.R. § 404.1527(c)(2).

40

According to 20 C.F.R. 404.1527(c)(2), if the treating physician's opinion is: (1) well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) is not inconsistent with the other substantial evidence in the case record, it is entitled to controlling weight, period. The ALJ did not dispute Dr. DeHaan's fibromyalgia diagnosis was supported by medically accepted clinical and laboratory diagnostic techniques. AR 32. Indeed, he could not, because the designated tenderpoints--the only medically acceptable clinical and laboratory diagnostic techniques for Ms. Miller's primary severe impairment--(fibromyalgia) were consistently well-documented by both Dr. DeHaan and by Ms. Miller's rheumatologist, Dr. Fanciullo. AR 310-311, 417-421 (Dr. DeHaan); AR 368, 387, 393 (Dr. Fanciullo).[5]

> Fibromyalgia is defined as a syndrome of chronic pain of musculoskeletal origin but uncertain cause. Stedman's Medical Dictionary , at 671 (27th ed. 2000). Further, "[the musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities." Harrison's Principles of Internal Medicine, at 2056 (16th ed. 2005). The American College of Rheumatology nonetheless has established diagnostic criteria that include "pain on both sides of the body, both above and below the waist, [and] point tenderness in at least 11 of 18 specified sites." Stedman's Medical Dictionary, supra.

Johnson v. Astrue, 597 F.3d 409, 410 (1st Cir. 2010).

In Johnson as in this case, the ALJ gave little weight to the treating physician's opinion regarding the claimant's fibromyalgia and its effect on her ability to work. Johnson, 597 F.3d at 412. The ALJ rejected the opinion because it relied primarily upon the claimant's subjective complaints and

---

[5] The ALJ recognized this because he acknowledged fibromyalgia was one of Ms. Miller's severe impairments. AR 26.

lacked supporting objective medical findings.   Id.  Because of the unique nature of fibromyalgia, however, the First Circuit criticized the ALJ's reasons for giving little weight to the treating physician's opinion:

> Dr. Ali's "need" to rely on claimant's subjective allegations . . .was not the result of some defect in the scope or nature of his examinations nor was it even a shortcoming.  Rather, "a patient's report of complaints, or history, is an essential diagnostic tool" in fibromyalgia cases, and a treating physician's reliance on such complaints "hardly undermines his opinion as to [the patient's] functional limitations."  Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003)(internal punctuation and citation omitted).  Further, since trigger points *are* the only "objective" signs of fibromyalgia, the ALJ "effectively [was] requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines," and this, we think, was error.

In this case, the ALJ gave two reasons for failing to give Dr. DeHaan's opinion controlling weight.  The first reason (that Dr. DeHaan is not a specialist) is simply not a valid reason under the Administration's own regulations.[6]

The court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis.  Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted).

---

[6]Ms. Miller correctly notes in her brief that whether the treating physician is a specialist is a factor that should be weighed along with several other factors to decide which opinion among the medical opinions in the file should be afforded the greatest weight.  But this factor becomes relevant *only* if it is determined the treating physician's opinion will not be given controlling weight.   20 C.F.R. § 404.1527(c)(2)-(6).

If the treating physician's opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, it is given it controlling weight and the other factors, including specialization, are irrelevant. Id.

The Commissioner's conclusions of law are not binding on the reviewing court. Smith, 982 F.2d at 311.  It is clear the ALJ committed an error of law in his analysis when he based his decision (in part)  that Dr. DeHaan's opinion  was not entitled to controlling weight on the fact that Dr. DeHaan was not a specialist.

The second reason the ALJ declined to assign controlling weight to Dr. DeHaan's opinion (that the large time gaps in Ms. Miller's treatment were inconsistent limitations he assigned pursuant to 20 C.F.R. § 404.1527(c)(2))  is not supported by substantial evidence in the record.  Neither Dr. DeHaan nor any other medical provider indicated that other, further, or more frequent treatment was necessary.  In January, 2010, Dr. Fanciullo (the *specialist*) stated he was handing Ms. Miller over to her primary care physician for the medication management of her fibromyalgia, because from his specialized standpoint, there was nothing more he could offer.  AR  368-369.  At that time, she had tried Lyrica, Cymbalta, and Savella, Hydrocodone and Relafen.  Id. Dr. Fanciullo suggested Ms. Miller should "get more consistent" with her exercise, and to engage in a "very low level" conditioning program.  He told her to see her primary care physician for medication management of her fibromyalgia, but did not indicate she needed to return to him (Fanciullo) for that purpose, and expressly stated he would not be managing her fibromyalgia. Id.

Similarly, Dr. DeHaan's records do not indicate a need to be seen more frequently that Ms. Miller was seen by him.  Although he documented severe

43

symptoms and moderate fatigue, along with multiple medications for
Ms. Miller's fibromyalgia pain (AR 310, 320)  Dr. DeHaan did not indicate there
was anything more that could have been accomplished with additional or more
frequent treatment.  Id.  When Ms. Miller saw Dr. DeHaan in August, 2011, she
reported chronic fatigue and fibromyalgia symptoms.  AR 329.  He increased
her pain medication and *instructed* her to return annually.  AR 330.  That she
did not return until the next August, therefore, is not inconsistent with
Dr. DeHaan's own medical record or any other medical record. Ms. Miller
testified at the hearing that she did not visit the doctor very often after she quit
working because (consistent with Dr. Fanciullo's note) she had been told there
was nothing more they could do for her, and her financial situation did not
allow it.  AR 59.  A claimant may not be penalized for failing to seek treatment
she cannot afford.  "It flies in the face of the patent purposes of the Social
Security Act to deny benefits to someone because he is too poor to obtain
medical treatment that may help him."  Lovejoy v. Heckler, 790 F.2d 1114,
1117 (4th Cir. 1986).  See also SSR 82-59 (justifiable cause for failure to follow
prescribed medical treatment includes inability to pay); Tome v. Schweiker, 724
F.2d 711, 714 (8th Cir. 1984) ("[W]e believe that a lack of sufficient financial
resources to follow prescribed treatment to remedy a disabling impairment may
be, and in this case is, an independent basis for finding justifiable cause for
noncompliance.").  The Commissioner cites authority for the proposition that a
claimant's financial situation should not *ipso facto* preclude her from
considering the claimant's failure to seek medical attention in the disability

44

determination.  See Murphy v. Sullivan, 953 F.2d 383, 386-387 (8th Cir. 1992);

Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987).  It does not appear that

in either of those cases, however, that the claimant's physician had specifically

advised that for the condition at issue, the claimant had been advised nothing

further could be done. [7]

"The opinion of a consulting physician who examines a claimant once or

not at all does not generally constitute substantial evidence." Kelley v.

Callahan, 133 F.3d 583, 589 (8th Cir. 1998); Forehand v. Barnhart, 364 F.3d

984, 987 (8th Cir. 2004) (same).  The State agency physicians opined Ms. Miller

was capable of sedentary, unskilled work.  AR 90, 100.[8]  The Commissioner

asserts the opinions of the State agency non-examining, non-treating

physicians constitute the "other substantial evidence" in the record with which

Dr. DeHaan's opinion is inconsistent.  Again, the court disagrees.  The State

agency physicians completed their reviews in October and December 2011 (AR

79 & 100).  They indicated they reviewed Dr. DeHaan's medical records (AR 74

& 95) but when they offered their functional capacity assessments, they did not

have the benefit of Dr. DeHaan's medical source statement which was not

completed until August-September, 2012.  AR 79, 100, 417.

---

[7] That Ms. Miller sought *mental health* treatment during the relevant time is not
persuasive as an inconsistency regarding the severity of Ms. Miller's
*fibromyalgia* condition, because as to that condition, Dr. Fanciullo's stated he
had nothing further to offer and Dr. DeHaan instructed Ms. Miller to return in
one year for medication management.

[8] In his written opinion the ALJ characterized Ms. Miller's capabilities as "less
than a full range of light work activity."  AR 32.

Dr. DeHaan specifically noted on his function report that Ms. Miller was not a malingerer.  AR 417.  Unlike Dr. DeHaan, neither of the State agency physicians ever examined Ms. Miller.  Unlike Dr. DeHaan, neither of the State agency physicians had the opportunity to observe Ms. Miller to decide for themselves whether the fibromyalgia symptoms she reported were real or feigned or to gauge first-hand the credibility of her reports of debilitating fibromyalgia pain.  Neither of State agency physicians would even know Ms. Miller if they met her on the street.  Finally, neither of them were privy to her Family and Medical Leave Act (FMLA) documents (AR 273-288), which verified she had used all available unpaid FMLA leave from her last job at CIGNA before she was terminated in September, 2011 for an unacceptable number of absences because of her medical condition.

In her brief, (Docket 15) the Commissioner suggests the FMLA documentation is not probative because it adds nothing to the discussion about Ms. Miller's disability for Social Security purposes.  The Commissioner observes the obvious that if Ms. Miller is awarded disability benefits, she will receive $14,640 per year without working.[9]   Accordingly, the Commissioner discounts the importance of the FMLA documents and states "[t]he records do not state whether or not Plaintiff could work or simply took leave because she would rather seek disability benefits than work . . .  Thus, the mere fact that

---

[9] The court notes this amount is barely ($2,870) above the federal poverty guidelines for a single person.
https://www.federalregister.gov/articles/2015/01/22/2015-01120/annual-update-of-the-hhs-poverty-guidelines#t-1  (last checked April 22, 2015).

[Miller] claimed FMLA leave is not probative without clinical findings of disabling limitations."[10]  Docket 15, p.4 at n.2.  The Commissioner suggests the FMLA leave was merely an unpaid vacation taken by Ms. Miller as a precursor to her SSI/SSD application.  This argument is specious:  while the fact that Ms. Miller was granted FMLA leave is not determinative of whether she is disabled under the Social Security laws, neither is it irrelevant.

"[T]he Commissioner is to make disability determinations based on social security law and therefore an opinion from a treating source that an individual is disabled rendered on an FMLA form is not binding on the issue of disability under the social security regulations." Little v. Astrue, 2011 WL 3555849 (W.D. Pennsylvania, Aug. 11, 2011) at *3 (citing 20 C.F.R. § 404.1504).  In Little, however, the treating physician, unlike Dr. DeHaan in this case, did not also complete a residual functional capacity assessment for purposes of the claimant's social security claim.  Id.  FMLA forms are not dispositive of a social security disability claim because, among other things, a successful social security disability claim requires a disability of twelve months duration while FMLA does not.  Roberson v. Astrue, 481 F.3d 1020, 1024 (8th Cir. 2007); Little, 2011 WL 3555849 at *3.

Nevertheless, "[u]nder the FMLA an eligible employee is entitled to 12 workweeks of leave during any 12-month period if he or she has a 'serious

---

[10] The court has explained above why Dr. DeHaan's opinion is supported by medically acceptable clinical and laboratory diagnostic techniques.  The only such clinical and diagnostic techniques for fibromyalgia are the 18 trigger points, and they are well documented by both DeHaan and the specialist, Dr. Fanciullo.  No medical provider—including the State agency consultants—dispute that Ms. Miller suffers from fibromyalgia.

health condition that makes the employee unable to perform the functions of the position of such employee.' 29 U.S.C. § 2611(11)." Spangler v. Federal Home Loan Bank of Des Moines, 278 F.3d 847, 851 (8th Cir. 2002). FMLA leave is not available at the whim of the employee. "When an employee provides the employer with notice that she may be in need of FMLA leave before the fact of the absence, it then becomes the employer's duty to determine whether or not the employee actually requires FMLA leave if there is some doubt as to whether or not the request would qualify." Spangler, 278 F.3d at 853, citing 29 U.S.C. § 2613(a). "Once the employer is notified, it has a duty to either provide FMLA time or follow the procedures set forth in the statute and regulations to verify the validity of the employee's request for time off 'by certification issued by the health care provider.' " Id. A review of 29 U.S.C. § 2913(a) & (b) reveals that the health care provider must certify (1) the date on which the serious health condition commenced; (2) its probable duration; (3) the appropriate medical facts within the knowledge of the provider regarding the condition; and (4) the medical necessity for intermittent leave and expected duration of treatment. If the employer remains skeptical after certification by the employee's physician, it can request a second opinion. 29 U.S.C. § 2613(c). If the two opinions differ, the employee can obtain (at the employer's expense) a third, final and binding opinion. 29 U.S.C. § 2613(d).

Therefore, while a FMLA certification is not binding on the Social Security Administration, it is likewise not completely irrelevant. Particularly when, as in Ms. Miller's case, the FMLA leave immediately preceded her final

48

departure from the workplace (she was fired for absenteeism after her FMLA leave ran out due to the same condition upon which she now bases her SSI/SSD claim) and the same physician that certified her FMLA claim has also provided supporting documentation for her SSI/SSD claim.  The Commissioner's claim that Ms. Miller's FMLA "records do not state whether or not Plaintiff could work or simply took leave because she would rather seek disability benefits than work" is a statement factually incorrect on this record and unworthy of the Commissioner.  Ms. Miller's FMLA records contain a several-page certification from Dr. DeHaan stating that Ms. Miller suffers symptoms of pain, fatigue and sedation from her medical conditions that can be expected to cause her to miss work approximately twice per month, with an average of three days of missed work per episode.  See AR 281-84.

The Commissioner in arguments before this court also puts forward several *post hoc* justifications for the ALJ's decision not to value Dr. DeHaan's opinion.  Among these justifications are:  (1) Dr. DeHaan recommended exercise for Ms. Miller which recommendation is allegedly inconsistent with his opinion of her functional limitations; (2) Ms. Miller's performance on the Bruce Protocol exercise stress test indicates she can perform light exertional work which is inconsistent with Dr. DeHaan's opinion as to Ms. Miller's functional limitations; (3) Dr. DeHaan completed a Physician Statement opinion in August 2012 and then prepared a revised statement one month later without performing an interim examination of Ms. Miller; (4) on January 8, 2010, Ms. Miller reported to Dr. Fanciullo that she "hurt all over" but she was still

49

working at this time;[11] (5) Dr. Fanciullo never opined that Ms. Miller was disabled;[12] and (6) Ms. Miller reported that the purchase of a new bed significantly reduced her pain, contradicting Dr. DeHaan's opinion.  See Docket No. 15 at pp. 4, 4 n.2, 5-7, 9.

None of these asserted rationale appear in the ALJ's opinion.  See AR 24-34.  The law of judicial review of administrative decisions is clear:  "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."  Securities & Exchange Comm'n. v. Chenery Corp., 332 U.S. 194, 196 (1947).  Therefore, these rationale, unarticulated and unrelied upon by the ALJ, cannot become the basis for this court's affirmance of the ALJ's decision.  Id.

The general rule is that non-examining, non-treating State agency physicians' opinions do not constitute "substantial evidence" in the record.  Kelley, 133 F.3d 583, 589; Forehand, 364 F.3d 987 (8th Cir. 2004); Cox, 345 F.3d 610; Anderson, 344 F.3d 812-13.  In Anderson, the Eighth Circuit instructed there were two situations when the general rule did not apply:

---

[11] The court notes that January 8, 2010, was the date of Dr. DeHaan's certification that Ms. Miller was suffering from a sufficiently severe condition that she should be granted leave under the FMLA.  See AR at 281-84.  Thus, although Ms. Miller was "employed" on January 8, 2010, she was actively seeking medical leave, a request which was ultimately granted.

[12] It is not clear at all that Dr. Fanciullo was ever *asked* to opine on Ms. Miller's disability status.

(1) where the consulting assessment is supported by better or more thorough medical evidence; (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.   For the reasons explained above, neither reason to disregard the general rule exists in this case.    The result is that the state agency opinions do not constitute substantial evidence.

Dr. DeHaan's opinions (1) are well-supported by medically accepted clinical and laboratory diagnostic techniques; and (2) are not inconsistent with other substantial evidence in the record.  The Commissioner erred by not giving Dr. DeHaan's opinion controlling weight.

### 2.    The Commissioner's Evaluation of Ms. Miller's Credibility.

This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  "When an ALJ reviews a claimant's subjective allegations of pain and determines whether the claimant and his testimony are credible, the ALJ must examine the factors listed in Polaski and apply those factors to the individual." Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).  See also Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).  In this case, the ALJ's credibility analysis begins on page seven of his written decision (AR 30).  It applies some of the Polaski factors and explains how they apply to Ms. Miller.  AR 30-32. The ALJ is not required to "explicitly discuss *each* Polaski factor in a methodical fashion" but rather it is sufficient if he "acknowledge[s] and

consider[s] those factors before discounting [the claimant's] subjective complaints of pain." Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996) (emphasis added).

The appropriate factors to be considered when evaluating whether a claimant's subjective complaints are consistent with the evidence as a whole are: (1) the objective medical evidence; (2) the claimant's daily activities; (3) the duration, frequency and intensity of pain; (3) dosage and effectiveness of medication; (4) precipitating and aggravating factors; (5) functional restrictions; (6) the claimant's prior work history; (7) observations by third parties; (8) diagnosis by treating and examining physicians; and (9) claimant's complaints to treating physicians.  See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001); Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993).

The ALJ did not explicitly cite Polaski but did cite 20 C.F.R. § 404.1529. AR 29. Ms. Miller acknowledges the ALJ discussed her activities of daily living and the objective medical evidence, but she asserts the ALJ improperly weighed or skewed the evidence in those categories as to how it impacted her credibility. Ms. Miller's primary criticisms are that the ALJ failed to properly consider her reasons for infrequent medical care and that he gave undue emphasis to her failure to follow the treatment recommendation to independently exercise to alleviate her fibromyalgia symptoms.

The ALJ began his analysis by noting "the medical evidence of record is scant with respect to claimant's allegations after the alleged disability onset date of September 7, 2011." AR 30.  He acknowledged that when Ms. Miller

last saw her rheumatologist (Dr. Fanciullo) in January, 2010, Dr. Fanciullo indicated he had nothing more to offer Ms. Miller.  Id., AR 368.  Dr. Fanciullo did, however, recommend a low-level exercise program.  Id.  The ALJ noted that Ms. Miller admitted to another medical provider (her mental health therapist) that she was not exercising regularly.  AR 30.  From this, the ALJ concluded "[t]he claimant's failure to follow through with treatment recommendations to stay active undermines the credibility of her allegations."  Id.

The ALJ summarized Ms. Miller's treatment with Dr. DeHaan.  He noted that although at her visit with Dr. DeHaan in August 2011 she was in "no apparent distress" her physical exam revealed diffuse pain consistent with fibromyalgia.  AR 30.  During this visit Ms. Miller also reported chronic fatigue and more frequent headaches.  AR 329.  Dr. DeHaan increased her pain medication.  Id.  Although the ALJ noted Ms. Miller did not see Dr. DeHaan again until the following August (August, 2012) the ALJ did *not* note that Dr. DeHaan instructed Ms. Miller to "return annually or prn." AR 30, 330.  The ALJ stated "[t]he significant gaps in the claimant's treatment history undermine the credibility of her allegations."  AR 31.

The ALJ next discussed Ms. Miller's four visits to the chiropractor (Dr. Neki) between February and August, 2012.  AR 31.  The ALJ concluded that because Ms. Miller reported to the chiropractor on her fourth visit that chiropractic treatment helped alleviate her pain (with the exception of her upper back) and that her pain level was 3/10, Ms. Miller's claims of debilitating pain were further undermined.  AR 31.

The ALJ discussed Ms. Miller's activities of daily living.  AR 31.  He noted she was able to live independently, cook, clean house, pay bills, drive and go out in public on her own.  He concluded "[t]he claimant's activities of daily living further diminish the persuasiveness of her allegations."  Id.   The ALJ considered the third-party function report submitted by Ms. Miller's live-in boyfriend, but discounted it because the ALJ did not perceive his report as limiting as the claimant portrayed herself, and to the extent it was consistent, the boyfriend "would benefit from the claimant receiving disability benefits by not having to support her."  AR 31.

The court has already explained why the gaps in treatment were not sufficient reason to refuse Dr. DeHaan's medical opinions controlling weight under 20 C.F.R. § 404.1527(c).  A different analysis applies regarding the significance of the lack of treatment as it pertains to Ms. Miller's credibility.  Some of the Polaski factors, and in turn the factors enumerated in 20 C.F.R. § 404.1529(c)(3) pertain to the claimant's medical treatment.  For example, the ALJ is to consider the type, dosage and effectiveness of the claimant's medications, and the treatment she has received to alleviate her pain.  See 20 C.F.R. § 404.1529(c)(3)(iv) & (v).

There is, however, another directive in the form of a Social Security Ruling (SSR) which guides the ALJ when he or she considers the effect of the lack of treatment or failure to follow prescribed treatment should have on the credibility determination.  SSR 96-7p addresses the credibility determination and how the adjudicator should consider each of the factors listed in 20 C.F.R.

§ 404.1529(c).  As to the consistency of medical care and adherence to

recommendations, SSR 96-7p states in relevant part:

Medical Treatment History

> In general, a longitudinal medical record demonstrating an
> individual's attempts to seek medical treatment for pain or other
> symptoms and to follow that treatment once it is prescribed lends
> support to an individual's allegations of intense and persistent
> pain or other symptoms for the purposes of judging the credibility
> of the individual's statements.  Persistent attempts by the
> individual to obtain relief of pain or other symptoms, such as by
> increasing medications, trials of a variety of treatment modalities
> in an attempt to find one that works or that does not have side
> effects, referrals to specialists, or changing treatment sources may
> be a strong indication that symptoms are a source of distress to
> the individual and generally lend support to an individual's
> allegations of intense and persistent symptoms.
>
> On the other hand, the individual's statements may be less
> credible if the level or frequency of treatment is inconsistent with
> the level of complaints, or if the medical reports or records show
> that the individual is not following the treatment as prescribed and
> there are no good reasons for this failure.  However, the
> adjudicator must not draw any inferences about an individual's
> symptoms and their functional effects from a failure to seek or
> pursue regular medical treatment without first considering any
> explanations that the individual may provide, or other information
> in the case record, that may explain infrequent or irregular medical
> visits or failure to seek medical treatment.  The adjudicator may
> need to recontact the individual or question the individual at the
> administrative proceeding in order to determine whether there are
> good reasons the individual does not seek medical treatment or
> does not pursue treatment in a consistent manner.  The
> explanations might provide insight into the individual's credibility.
> For example:
>   - The individual's daily activities may be structured so as to
>     minimize symptoms to a tolerable level or eliminate them
>     entirely, avoiding physical or mental stressors that would
>     exacerbate the symptoms. The individual may be living with
>     the symptoms, seeing a medical source only as needed for
>     periodic evaluation and renewal of medications.

55

- The individual's symptoms may not be severe enough to prompt the individual to seek ongoing medical attention or may be relieved with over-the-counter medications.
- The individual may not take prescription medication because the side effects are less tolerable than the symptoms.
- The individual may be unable to afford treatment and may not have access to free or low-cost medical services.
- The individual may have been advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual.
- Medical treatment may be contrary to the teaching and tenets of the individual's religion.

See SSR 96-7p, Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, Policy Interpretation, Medical Treatment History, pp. 11-13.

At the administrative hearing, Ms. Miller explained why her doctor visits were infrequent. She told the ALJ that she formerly saw her treating physician every three to six months, but lately only once per year because she was "at the point where there isn't much else they can do for me." AR 59. She also explained she was completely without insurance for a period of time and when she did have insurance again, the deductible was very high so she tried "to limit any visits to when [she] absolutely had to . . ." Id. She also acknowledged that she was supposed to be exercising but she was not on a "regular" exercise program because her pain made exercise difficult. AR 60. Ms. Miller's explanation for her infrequent doctor visits are entirely consistent with Dr. Fanciullo's indication there was nothing more he could do for her fibromyalgia condition (AR 368) and Dr. DeHaan's instruction to return for medication adjustments on an annual basis (AR 330). As to the ALJ's

conclusion that Ms. Miller was not credible because she failed to comply with Dr. DeHaan's recommendation that she exercise for 30 minutes per week (AR 401), Ms. Miller correctly notes that SSR 82-59 prohibits the denial of benefits for failure to follow medical advice unless the treatment is "clearly expected to restore the claimant's ability to engage in substantial gainful activity." Id., POLICY STATEMENT, Treatment Expected to Restore Ability To Work, p. 3. There is no such indication in this record.

The ALJ also discounted Ms. Miller's credibility because her pain was diminished upon four chiropractic treatments in 2012, after her date of onset. AR 31. Ms. Miller notes that although her pain levels were successfully decreased with chiropractic care, she had by then left the workplace after having been fired from her job in September, 2011. AR 275. It is true that "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling." Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993) (citation omitted). Although Dr. Neki noted improvement in Ms. Miller's condition in August, 2012, he instructed her to "restrict all activity in accordance with symptomatology present." AR 633. In light of that admonition, the four chiropractic sessions she received and any pain relief they provided do not provide substantial evidence that her fibromyalgia pain was "controlled" pursuant to Stout.

The ALJ's final reason for discrediting Ms. Miller's testimony regarding her pain symptoms was "the claimant described daily activities that are not limited to the extent one would expect, given the complaints of disabling

symptoms and limitations.  The claimant reported she was able to live independently, cook, clean house, pay bills, drive, and go out in to the public on her own.  The claimant's intact activities of daily living further diminish the persuasiveness of her allegations." AR 31.  During the hearing, Ms. Miller explained her activities of daily living took her longer than normal and caused increased pain.  AR 57.  She drives, but not after taking her pain medication because it makes her feel "out of it." AR 58.  She has trouble sleeping.  AR 52. The Eighth Circuit has cautioned that "in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity." Brosnahan v. Barnhart, 336 F.3d 671, 677 (8th Cir. 2003).

If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the court should normally defer to the ALJ's credibility determination.  Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).  The ALJ's credibility determination focused primarily on Ms. Miller's infrequent medical care and her failure to exercise.  Ms. Miller provided explanations for her infrequent medical care and failure to exercise, and there is no indication in the record that more frequent medical care or adherence to a light exercise schedule would have restored Ms. Miller's capacity to engage in substantial, gainful activity.  See SSR 82-59.  In this case, the court cannot defer to the Commissioner's credibility determination because it is not supported by substantial evidence. Ms. Miller's credibility should be determined anew upon remand.

### 3.   The Commissioner's Evaluation of Whether Ms. Miller's Fibromyalgia Was Medically Equal to A Listed Impairment.

Ms. Miller asserts the Commissioner erred by failing to find her fibromyalgia was medically equal to a listed impairment at Step Three of the five-step analysis. The ALJ's Step Three analysis is found beginning on the bottom of the fifth page of his written decision (AR 28). It consists of three sentences (AR 29) and concludes that Ms. Miller's impairments do not medically equal a listing. Id.  The entirety of the ALJ's finding is reproduced below:

> The undersigned has considered the claimant's medically determinable impairments of fibromyalgia and obesity. A specific listing does not cover these impairments. The undersigned finds that these impairments, together or in combination with any other impairment, does not medically equal a listing.

SSR 12-2p provides specific guidance for the Commissioner in how to determine whether Ms. Miller's primary severe impairment (fibromyalgia) is medically equal to a listed impairment. Specifically, in the POLICY INTERPRETATION section, SSR 12-2p explains,

> V.    How do we find a person disabled based on an MDI of FM? Once we establish that a person has an MDI of FM, we will consider it in the sequential evaluation process to determine whether the person is disabled. As we explain in section VI below, we consider the severity of the impairment, whether the impairment medically equals the requirements of a listed impairment, and whether the impairment prevents the person from doing his or her past relevant work or other work that exists in significant numbers in the national economy.

> VI.    How do we consider FM in the sequential evaluation process? As with any adult claim for disability benefits, we use a 5-step sequential evaluation process to determine whether an adult with an MDI of FM is disabled.

\*\*\*

     C.    At Step 3, we consider whether the person's impairment(s) meets or medically equals the criteria of any of the listings in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (appendix1).  FM cannot meet a listing in appendix 1 because FM is not a listed impairment.  At step 3, therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment.

    \*\*\*

Id. at pp. 7-8.

The Social Security Administration's regulations do not contain much guidance on the subject of how the Commissioner is to go about determining whether a claimant's impairment is medically equivalent to a listed impairment.   The Administration has published a non-binding guideline Program Operations Manual (POMS).  It states in relevant part:

**DI 24505.015 Finding Disability Based on the Listing of Impairments**

**How do we determine medical equivalence?**
\*\*\*

b.    If the claimant has an impairment that is not described in the Listing of Impairments, we will compare their findings with those for closely analogous listed impairments. If the findings related to the claimant's impairment are at least of equal medical significance to those of a listed impairment, we determine their impairment is medically equivalent to the most closely analogous listing.

c.    If the claimant has a combination of impairments, none of which meets a listing, we will compare their findings with those for closely analogous listed impairments. If the findings related to the claimant's impairments are at least of equal medical significance to those of a listed impairment, we determine the combination of

60

impairments is medically equivalent to the most closely analogous
listing.

See https://secure.ssa.gov/poms.nsf/lnx/0424505015 (last checked April 22,

2015).  In this instance, the ALJ indicated he combined Ms. Miller's medically

determinable impairments of fibromyalgia and obesity, "together or in

combination with any other impairment" and determined they did not

medically equal a Listing.  The ALJ did not, however, indicate which Listing he

considered most closely analogous for purposes of comparison.  The ALJ's Step

Three analysis is therefore practically impossible for a reviewing court to

analyze.  This court cannot speculate as to the ALJ's reasoning regarding the

Listing equivalence.  Collins v. Astrue, 648 F.3d 869, 872 (8th Cir. 2011).  On

remand, however, the ALJ should provide a more thorough and reviewable

discussion regarding whether Ms. Miller's fibromyalgia, alone or in combination

with her other impairments, meets or equals a Listed impairment at Step Three

of the analysis.

  **4. The Commissioner's Determination of Ms. Miller's RFC.**

   If the district court agrees Dr. DeHaan's opinion should be given

controlling weight, the Commissioner's formulation of the RFC on remand may

be a moot point because the ALJ, with assistance from the vocational expert

(VE) explained during the hearing that adoption of Dr. DeHaan's opinion

regarding Ms. Miller's residual functional capabilities would preclude Ms. Miller

from any substantial gainful employment.  AR 67-69.  Nevertheless,

Ms. Miller's argument regarding the RFC formulation is discussed briefly

below.

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. October 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must "consider the combination of the claimant's mental and physical impairments."  Lauer, 245 F.3d at 703. Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all the relevant evidence . . . a claimant's residual functional capacity is a medical question."  Id. (citations omitted). "Some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  Id. (citations omitted).  Finally, "[t]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered).

In her brief, Ms. Miller asserts the ALJ's determination of her RFC was deficient in three ways.  First, Ms. Miller asserts the ALJ failed to incorporate limitations which corresponded with her admittedly severe impairment (fibromyalgia).  Second, she asserts the FMLA documentation which verified her excessive and ongoing absences was never properly considered. Third, Ms. Miller asserts the ALJ failed to incorporate any limitations into her RFC which represent deficiencies in concentration, persistence or pace due to either mental impairments or chronic pain.

Ms. Miller asserts the ALJ improperly insisted upon the presence of objective findings to support the fibromyalgia symptoms she reported and the corresponding limitations which her treating physician imposed. Ms. Miller asserts the ALJ's insistence on the presence of objective findings is especially prejudicial error when the medical impairment is fibromyalgia.  This is so because fibromyalgia is by definition inconsistent with objective medical evidence.

The ALJ's residual functional capacity analysis begins on page six of his written decision.  AR 29.  He stated his conclusion in the opening paragraph, which indicated that after "careful consideration" of the entire record, he concluded Ms. Miller could perform less than the full range of light duty work. AR 29.  In other words, she could lift and carry 20 pounds occasionally and 10 pounds frequently.  She could sit for 6 hours and stand/walk for 4 hours out of an 8 hour work day (with normal breaks).  She had no limitations in pushing, pulling, or balancing.  She could frequently stoop, crouch, kneel,

crawl, climb ladders, ropes, scaffolds, stairs and ramps.  She had no manipulative, visual, communicative or environmental limitations.  AR 29.

The ALJ cited 20 C.F.R. § 404.1529 (how to evaluate symptoms, including pain), SSR 96-4p (symptoms, medically determinable physical and mental impairments, and exertional and non-exertional limitations), SSR 96-7p (evaluation of symptoms in disability claims: assessing the credibility of an individual's statements), and 20 C.F.R. § 404.1527 (evaluating opinion evidence) and SSR 96-2p (giving controlling weight to treating source medical opinions), 96-5p (medical source opinions on issues reserved to the commissioner), 96-6p (consideration of state agency findings of fact and medical equivalence) and 06-3p (considering opinions from sources who are not acceptable medical sources and decisions from other governmental and non-governmental agencies) as the standards which guided him.

The ALJ began his analysis by reviewing the function report Ms. Miller completed which estimated her own abilities.  AR 29, 233-240.  He reviewed Ms. Miller's hearing testimony which described her fibromyalgia tender points and pain.  AR 30.  She also described chronic pain and fatigue.  Id.  She likewise described migraine headaches which occurred once or twice a week. Id.  She took a combination of over-the-counter and prescription medication for her headaches.  AR 30.  She took prescription medication for her fibromyalgia pain.  Id.  Although the ALJ indicated in his written decision that Ms. Miller "was able to live independently, cook, clean do house chores, care for her own needs . . ." (AR 29), he also noted Ms. Miller's testimony that simple tasks such

64

as folding a basket of clothes caused pain and cleaning the bathroom requires frequent breaks.  AR 30.   The ALJ found Ms. Miller's medically determinable impairments could reasonably be expected to cause her symptoms, but her statements about the intensity, persistence and limiting effects of the symptoms were "not fully credible" to the extent they were inconsistent with the RFC he assigned.

Next, the ALJ reviewed the medical evidence.  Id.  He noted the "objective medical evidence indicates claimant was no more limited physically than as set forth in the residual functional capacity above."   The ALJ reviewed medical records from Ms. Miller's treating rheumatologist (Dr. Fanciullo) who at Ms. Miller's last visit with him documented 10 fibromyalgia tenderpoints and concluded he had nothing further to offer Ms. Miller.  AR 30.  Dr. Fanciullo indicated Ms. Miller's medication management would be handled by her primary care physician and psychiatrist.  Id.  The ALJ noted Ms. Miller's treatment with her mental health care provider (Linda Kauker) and that Ms. Miller noted improvement in pain symptoms medication (Gabapentin). Kauker also noted, however, that Ms. Miller was not exercising as recommended.  Id.   The ALJ reviewed Dr. DeHaan's treatment notes which included documentation of symptoms consistent with fibromyalgia and headaches.  AR 30. Ms. Miller told Dr. DeHaan she wanted to go on disability. Id.  The ALJ noted the long gap in between treatment with Dr. DeHaan.  Id.   At her next visit, Ms. Miller again complained of fibromyalgia symptoms and worsening headaches.  AR 31.  Her extremities were normal with no swelling.

65

Id.  Although Dr. DeHaan had instructed Ms. Miller to return on a yearly basis, the ALJ indicated "the significant gaps in the claimant's treatment history undermine the credibility of her allegations." Id.

The ALJ also noted Ms. Miller's chiropractic care, which she reported alleviated her pain symptoms.  This, the ALJ concluded, also undermined her credibility.  Id.  He  further noted that Ms. Miller was obese, which "could reasonably be expected to result in some fatigue and aggravate the fatigue and pain caused by her other impairments."  Id.  The ALJ indicated he had considered this and "incorporated the appropriate limitations into the [RFC]." Id.

The ALJ did not consider Ms. Miller's description of her activities of daily living as limited as he expected, given her complaints of disabling pain.  AR 31. He discounted Ms. Miller's function report and the function report completed by her boyfriend as not credible and not consistent with each other.  Id.

Finally, the ALJ analyzed the medical opinion evidence. AR 32.  He adopted the opinions of the State agency physicians because their opinions were "consistent with the medical evidence of record taken as a whole  . . ." Id.

### (a)    Fibromyalgia Symptoms.

Ms. Miller's primary criticism regarding the ALJ's formulation of her RFC is that when he determined her credibility, he did not properly consider that fibromyalgia is a condition which is not amenable to objective findings. BecauseMs. Miller's physical examinations did not yield typical findings such as swelling, decreased range of motion and decreased strength, she asserts the

ALJ did not properly assign physical restrictions in her RFC which coincide with her admittedly severe fibromyalgia impairment.

The Eighth Circuit has noted that fibromyalgia is a disease which is "chronic, and diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests.  . . .We have long recognized that fibromyalgia has the potential to be disabling." Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 2004) (citations omitted, punctuation altered).  Where the ALJ rejected a claimant's fibromyalgia symptoms and complaints because they were not "substantiated by objective medical testing" the Eighth Circuit reversed and remanded the case because the ALJ "misunderstood fibromyalgia" which likewise adversely affected the ALJ's formulation of the claimant's RFC analysis. Garza v. Barnhart, 397 F.3d 1087, 1089 (8th Cir. 2005).

SSR 12-2p  went into effect on July 25, 2012 (a few months before the ALJ's written decision on October 12, 2012) in this case.   The POLICY INTERPRETATION portion of the Ruling, Section VI, contains guidance regarding the sequential evaluation process.  It states in relevant part:

> D. Residual Functional Capacity (RFC) assessment:  In our regulations and SSR 96-8p, we explain that we assess a person's RFC when the person's impairment(s) does not meet or equal a listed impairment. We base our RFC assessment on all relevant evidence in the case record.  We consider the effects of all of the person's medically determinable impairments, including impairments that are not 'severe.' For a person with FM, we will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'
> E.  At steps 4 and 5, we use our RFC assessment to determine whether the person is capable of doing any past relevant work (step 4) or any other work that exists in significant numbers in the national economy (step 5). If the person is able to do any past

relevant work, we find that he or she is not disabled.  If the person is not able to do any past relevant work or does not have such work experience, we determine whether he or she can do any other work.  The usual vocational considerations apply.

        1.      Widespread pain and other symptoms associated with FM, such as fatigue, may result in exertional limitations that prevent a person from doing the full range of unskilled work in one or more of the exertional categories in appendix 2 of subpart P of part 404 (appendix 2).  People with FM may also have nonexertional physical or mental limitations because of their pain or other symptoms.  Some may have environmental restrictions, which are also nonexertional.

        2.      Adjudicators must also be alert to the possibility that there may be exertional or nonexertional (for example, postural or environmental) limitations that erode a person's occupational base sufficiently to preclude the use of a rule in appendix 2 to direct a decision.  In such cases, adjudicators must use the rules in appendix 2 as a framework for decision-making and may need to consult a vocational resource.

See SSR 12-2p, POLICY INTERPRETATION, Section VI (How do we consider FM in the sequential evaluation process? (C), (D) & (E)), pp. 8-9.  Upon remand,  if the Commissioner's evaluation of Ms. Miller's claim proceeds to Step Four of the analysis, the assigned adjudicator is directed to carefully apply the instructions found in SSR 12-2p.

      **(b)**      **FMLA Information.**

The FMLA documentation which is in the appeal record (AR 273-288) was not available to the ALJ before he issued his written decision. Ms. Miller testified about her FMLA leave, however, during the hearing. AR 55-56.  The Appeals Council considered the information (AR 6), but did not find that it constituted a basis for changing the ALJ's decision.  AR 2. Ms. Miller asserts the FMLA information is crucial because it verifies her fibromyalgia and associated symptoms caused excessive absence from work and lends credibility

to not only her own testimony, but also her physician's medical opinions.  The court agrees.

The FMLA evidence which was created in 2010 is consistent with Dr. DeHaan's 2012 opinion evidence and with Ms. Miller's hearing testimony. The FMLA information lends credibility to Ms. Miller's assertions regarding her inability to concentrate at work and her ultimate termination from her job because of her absences and poor performance.   "It is well settled that the Commissioner is to make disability determinations based on social security law and therefore an opinion from a treating source that an individual is disabled rendered on an FMLA form is not binding on the issue of disability under the social security regulations."  Little v. Astrue, 2011 WL 3555849 (W.D. Pennsylvania, Aug. 11, 2011) at *3 (citing 20 C.F.R. § 404.1504).  Nevertheless, "[u]nder the FMLA an eligible employee is entitled to 12 workweeks of leave during any 12-month period if he or she has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.' 29 U.S.C. § 2611(11)."  Spangler v. Federal Home Loan Bank of Des Moines, 278 F.3d 847,851 (8th Cir. 2002).   The FMLA information therefore, while not determinative is at least relevant to the Commissioner's findings as to credibility, opinion evidence, and RFC.  The court agrees that the Appeals Council gave short shrift to the FMLA information when it refused to reconsider the ALJ's denial of benefits.

**(c)** **Limitations in Concentration, Persistence or Pace.**

Next, Ms. Miller asserts the ALJ failed to consider the concentration, persistence and pace limitations presented by her pain and non-severe mental impairments.  The ALJ determined on page four through five of his written opinion (AR 27-28) that Ms. Miller had non-severe impairments of affective disorder and personality disorder.  AR 27.  He determined these mental impairments imposed mild limitations in concentration, persistence, or pace. AR 28.  He could have indicated the limitations imposed by Ms. Miller's mental impairments were "none" but instead indicated they were "mild."  Id. Ms. Miller's treating physician (Dr. DeHaan) indicated Ms. Miller's pain symptoms would interfere with the amount of concentration and attention necessary even for unskilled work and that she could tolerate only low stress work.  AR 365, 418.

Limitations which result from mild physical and mental impairments must be included in the claimant's RFC. "The RFC must include the limitations from all medically determinable impairments, regardless of whether they are considered severe.  SSR 96-8p.  ('In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.')"  Cooks,  2013 WL 5728547 at *7.  See also, Thomas v. Colvin, 745 F.3d 802, 807 (7th Cir. 2014) (limitations imposed by non-severe impairments of fibromyalgia, sciatica, thumb inflammation and arthritis excluded from RFC).  "These too should have been

70

considered in concert with [claimant's] other impairments to determine their collective effect on her ability to work . . . we cannot find that these errors were harmless. It seems to us that taking all of [claimant's] impairments together would result in a more restrictive RFC than the ALJ formulated." Thomas, 745 F.3d at 807.

In White v. Commissioner of Social Security, 312 Fed. Appx. 779, 790 (6th Cir. 2009), the case was reversed and remanded because the ALJ completely discounted claimant's non-severe mental impairment in formulating the RFC.  "[T]he combined effect of all impairments must be considered, even if other impairments would not be severe." White, 312 Fed. Appx. at 787. Likewise, in Patty v. Barnhart, 189 Fed. Appx. 517, 522  (7th Cir. 2006)  the case was reversed and remanded because the ALJ failed to incorporate the claimant's mild mental limitations as imposed by the mental RFC into the hypothetical posed to the VE at the hearing.   "The hypothetical that an ALJ poses to a VE ordinarily must include *all* limitations supported by medical evidence in the record, including limitations imposed by depression." Patty, 189 Fed. Appx. 517 at 521 (citations omitted, punctuation altered).    The ALJ's omission of any mental limitations from Ms. Miller's RFC requires remand in this case.

**F.    Type of Remand.**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record.  Ms. Miller requests reversal of the Commissioner's decision with remand and instructions for an

award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id., Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION and RECOMMENDATION

Based on the foregoing law, administrative record, and analysis, this court respectfully RECOMMENDS to the District Court that the Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 27th day of April, 2015.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge